# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| SHEIANNE MARLENE-ELOISE BUTLER, | ] ] ] |
| Plaintiff, | ] ] |
| v. | Case No.: 2:24-cv-172-ACA ] ] |
| COMISSIONER, SOCIAL SECURITY ADMINISTRTAION, | ] ] ] ] |
| Defendant. | ] |

## MEMORANDUM OPINION

Plaintiff Sheianne Marlene-Eloise Butler appeals the decision of the Commissioner of Social Security finding Ms. Butler not disabled. (Doc. 1). Based on the court's review of the administrative record and the parties' briefs, the court **WILL AFFIRM** the Commissioner's decision.

## I.    PROCEDURAL HISTORY

In February 2021, Ms. Butler applied for disability insurance benefits and supplemental security income (SSI) benefits, alleging disability beginning May 14, 2006. (Doc. 6-3 at 11; doc. 6-7 at 15–32). The Commissioner initially denied both claims (doc. 6-3 at 11; doc. 6-5 at 12–28), and Ms. Butler requested a hearing before an Administrative Law Judge ("ALJ") (doc. 6-5 at 50). After holding a hearing (doc. 6-3 at 45–65), the ALJ issued an unfavorable decision (*id.* at 26). The Appeals

Council denied Ms. Butler's request for review (doc. 6-3 at 2), making the Commissioner's decision final and ripe for the court's judicial review. *See* 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The court "must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quotation marks omitted). "Under the substantial evidence standard, this court will affirm the ALJ's decision if there exists such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (quotation marks omitted). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel*, 631 F.3d at 1178 (quotation marks omitted). The court must affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004) (quotation marks omitted).

Despite the deferential standard for review of claims, the court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Henry*, 802 F.3d at 1267 (quotation marks

omitted). Moreover, the court must reverse the Commissioner's decision if the ALJ does not apply the correct legal standards. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

To determine whether an individual is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

### III.   EVIDENCE AND ALJ'S DECISION

The court begins by describing the evidence submitted to the ALJ, followed by the ALJ's decision.

As a child, Ms. Butler's "[m]ilestones occurred on time, except for speech as there were some difficulties with articulation." (Doc. 6-9 at 24). Beginning in 2006 at the age of four, Ms. Butler was sexually abused on at least two occasions, which resulted in Ms. Butler's posttraumatic stress disorder ("PTSD") and forced her family to move to a different state. (Doc. 6-11 at 118; doc. 6-10 at 145; doc. 6-13 at 16, 18). Throughout Ms. Butler's childhood, her family experienced significant

stressors, including financial and mental health struggles (*see, e.g.,* doc. 6-9 at 24, 82, 101–04). From elementary school through high school, Ms. Butler was in special education and had an individualized education program ("IEP"). (*Id.* at 99; doc. 6-10 at 104).

Around 2010, Ms. Butler was diagnosed with attention deficit hyperactivity disorder ("ADHD"), a learning disorder, and a phonological disorder. (Doc. 6-9 at 24, 29). At this time, Ms. Butler took medication for her ADHD, and "her report card reflected all [satisfactory marks]." (*Id.* at 40). By the end of second grade, however, Ms. Butler received unsatisfactory marks in reading and math. (*Id.* at 120–21).

Also in 2010, the family was evicted from their home and moved across the country, resulting in Ms. Butler's exhibition of behavioral problems such as not listening and using profanity. (*Id.* at 39). The cross-country move was unsuccessful, and Ms. Butler's family moved back to their previous state. (Doc. 6-9 at 57). The record reflects that Ms. Butler has some suicidal ideation and/or attempted suicide from she was a child. (*See* doc. 6-9 at 97 (discussing Ms. Butler's past suicide attempt prompting a change in medication in 2009); doc. 6-12 at 48 (stating that "Ms. Butler has a history of suicidal thoughts but has never made an attempt"); *but see* doc. 6-11 at 116 (stating that Ms. Butler "has no history of suicidal or homicidal

4

ideation")). In early 2011, Ms. Butler was treated for symptoms of ADHD, a learning disorder, and a phonological disorder. (Doc. 6-9 at 39).

In 2013, Ms. Butler's school psychologist evaluated her as having "clinically significant" anxiety, attention, learning, and functional communication problems. (Doc. 6-10 at 131). Ms. Butler was "at risk" for adaptability, social skills, leadership, and study skills problems. (*Id.*). And Ms. Butler was "average" as to hyperactivity, aggression, conduct problems, depression, and withdrawal problems. (*Id.*). In October 2016, Ms. Butler's school system notified Ms. Butler's parents that she was "eligible for special education services as a student . . . with a specific learning disability." (Doc. 6-10 at 123). In high school, Ms. Butler had a third grade reading level and a fourth grade math level. (*Id.* at 109). In December 2017, Ms. Butler began to see Sandhya Rajasekhara, M.D., who eventually diagnosed Ms. Butler with PTSD. (Doc. 6-10 at 57, 59).

In September 2018, a student sent Ms. Butler a sexually explicit photo on social media, which triggered her PTSD. (Doc. 6-10 at 143). At this time, Ms. Butler had "trouble getting out of bed and going to school" due to paranoia, so Dr. Rajasekhara ordered Ms. Butler to be educated via homebound special education services, in which a special education teacher taught Ms. Butler at her house for a few hours per week. (Doc. 6-3 at 56–57; doc. 6-10 at 73; doc. 6-11 at 20; doc. 6-10 at 88). Ms. Butler's homebound teacher indicated that Ms. Butler had "serious"

5

problems with math, expressing ideas in written form, and applying problem solving skills; and "obvious" problems with understanding vocabulary, reading comprehension, articulating explanations, learning new material, recalling previously learned material, focusing long enough to finish assignments, carrying out multi-step instructions, and working at a reasonable pace. (Doc. 6-10 at 89–90). In all other areas, Ms. Butler had "no" or "slight" problems. (*Id.*). In February 2020, Ms. Butler graduated from high school with a 1.6 grade point average. (Doc. 6-11 at 2–3).

Prior to reaching the age of eighteen, Ms. Butler applied for and received child disability services for ADHD, bipolar disorder, and PTSD. (*See* doc. 6-11 at 115). In December 2018, at the request of the Social Security Administration, Ms. Butler saw Glenn Shean, PhD, who opined that she was "guarded," her affect was flat, and she was withdrawn from social contacts and refused to go to school due to the pornographic photo incident described above. (Doc. 6-10 at 142–43). Dr. Shean wrote that Ms. Butler had a low average to borderline functional cognitive processing range, poor short- and long-term memories, and marginal working memory. (*Id.* at 144). Ms. Butler could do serial threes and simple similarities, but could not spell words backward, recall the capital of her home state, or do serial sevens. (*Id.*). He diagnosed her with PTSD and recommended that Ms. Butler return to counseling to deal with her anxiety and trauma. (*Id.* at 145). Finally, he found that

6

Ms. Butler would not be able to function in a "school [or] work context" or interact with coworkers and classmates. (Doc. 6-10 at 145).

After Ms. Butler turned eighteen, her benefits were discontinued. (*See* doc. 6-11 at 115). In order to continue her benefits, Ms. Butler submitted new applications for disability and SSI benefits and subsequently saw several medical examiners. (Doc. 6-7 at 15–32). In May 2021, Ms. Butler saw Daniel Walter, PsyD, who diagnosed Ms. Butler with ADHD, a severe learning disorder, and severe trauma- and stressor-related disorders. (Doc. 6-4 at 3, 6). He opined that the records showed a learning disorder, PTSD, and ADHD, but that "[d]ue to failure to cooperate, there [wa]s insufficient evidence to make a decision" about her claim. (*Id.* at 5).

In October 2021, Ms. Butler saw Karen Russell, PsyD, who diagnosed her with an anxiety disorder. (Doc. 6-11 at 115). Dr. Russell remarked that Ms. Butler enjoyed taking care of her family's pets, cooking, and helping her mother clean. (*Id.* at 116). Ms. Butler reported that her therapist encouraged her to get outside of the house more and look for a job, although a recent trip to the pharmacy with her father made her feel "overheated." (*Id.*). Dr. Russell wrote that Ms. Butler was fully independent with all activities of daily living, engaged in her own hygiene, had no difficulty sleeping, and met no criteria for a manic episode. (*Id.* at 116). At this examination, Ms. Butler reported no significant depression or anxiety symptoms, stating that anxiety symptoms only occurred when "forced to be in social situations

without one of her parents." (Doc. 6-11 at 116). Dr. Russell stated that Ms. Butler was hopeful to find a job coach and start leaving the house without her parents more often. (*Id.*). At the appointment, Ms. Butler was "relaxed," "alert," and "fully oriented." (*Id.*).

Dr. Russell then administered a WAIS-IV intelligence test, on which Ms. Butler scored a 71 on full scale IQ, 81 on verbal comprehension, 77 on perceptual reasoning index, 60 on working memory index, and 81 on processing speed index. (*Id.* at 117). These scores were in "extremely low" to "low average" ranges. (Doc. 6-11 at 117). Dr. Russell found that Ms. Butler was "fully functional" with strong verbal comprehension despite weak working memory and visual-spatial planning. (*Id.*). Based on the results of the examination, Dr. Russell concluded that Ms. Butler had the full mental capacity to maintain regular attendance in a work setting, even if she needs to start working from home at first. (*Id.* at 118).

Upon reconsideration, in November 2021, Ms. Butler saw Stephen Saxby, PhD, who also diagnosed her with a learning disorder and trauma- and stressor-related disorders. (Doc. 6-4 at 14). After summarizing previous medical examinations in the record, Dr. Saxby remarked that Ms. Butler had normal memory and attention span, could occasionally accompany her mom on grocery store visits, and could occasionally visit her family members. (*Id.* at 18).

The record also contains treatment notes from Ms. Butler's therapist, Anthony Foy, LCSW, in from late 2019 through 2021. (*See generally* doc. 6-12). Mr. Foy diagnosed Ms. Butler with bipolar II disorder and ADHD. (*See e.g.*, *id.* at 50). Mr. Foy appears to be the only provider who has diagnosed Ms. Butler with bipolar disorder. (*See id.*; *but see* doc. 6-11 at 116) (Dr. Russell describing Ms. Butler's bipolar disorder as "questionable")).

At intake, Mr. Foy described Ms. Butler as "friendly, attentive, communicative, and relaxed." (Doc. 6-12 at 50). She exhibited "logical thinking" and no signs of hallucinations, delusions, or other indicators of psychotic process. (*Id.*). Mr. Foy wrote that she had "cognitive functioning in the normal range," "no signs of anxiety," and no hyperactive or attentional difficulties. (*Id.*). From January to March 2020, Ms. Butler worked with Mr. Foy to reprocess some of her traumatic memories, leading her to feel stabilized at the end of the session, although she often expressed anxiety during each session. (*See e.g.*, doc. 6-12 at 36, 42). Ms. Butler reported good medication compliance, normal family and friend relationships, well-controlled anger or no outbursts, no impulsive behaviors, and she was not confused. (*Id.*). During her June 2020 visits with Dr. Foy, Ms. Butler reported no intrusive, traumatic memories (*id.* at 28), though she had anxiety about job applications and online dating (*id.* at 30, 32).

In July 2020, Ms. Butler discussed family problems with Mr. Foy. (Doc. 6-12 at 24). She also reported social anxiety and told him that she did not feel comfortable in crowds. (*Id.*). She did not feel depressed. (*Id.* at 26). Mr. Foy wrote that Ms. Butler had anxiety about getting a job, but that she had the desire to work and had filled out an application with the local humane society. (*Id.*). He also wrote that she was "delayed in responding to questions and often needs to ask for clarification for meaning of questions." (Doc. 6-12 at 26). During her visits in July 2020, Ms. Butler's self-care skills were intact, she displayed well-controlled or no anger, had normal friend and family relationships, and was sleeping regularly, though at times, excessively. (*Id.* at 24, 26).

In August 2020, Ms. Butler and her mother spoke to Mr. Foy about medication compliance because Ms. Butler was not letting her mother know ahead of time that her medication needed refills. (Doc. 6-12 at 18). Ms. Butler displayed no anger and was "not struggling with past memory related to childhood sexual trauma." (*Id.* at 22). A month later, Ms. Butler reported some anger outbursts and indicated that her anxiety that was keeping her from obtaining employment. (*Id.* at 16).

A year later, Ms. Butler displayed symptoms of anxiety, depression, and PTSD at her sessions; felt irritable; reported recent anger outbursts; and verbalized recurring traumatic memories. (Doc. 6-12 at 4). Mr. Foy explained that Ms. Butler had made little progress getting out of the house and finding a job due to her social

10

anxiety and "poor follow[-]through in getting applications in." (*Id.* at 5). Despite her "minimal response to treatment," Mr. Foy reported that Ms. Butler exhibited no signs of cognitive difficulty or abnormal attention span. (*Id.* at 4, 5).

In the ALJ's decision, the ALJ determined that Ms. Butler had not engaged in substantial gainful activity since her May 14, 2006 alleged onset date. (Doc. 6-3 at 13). The ALJ found that Ms. Butler's anxiety disorder and PTSD were severe impairments, but that Ms. Butler's borderline intellectual functioning and prior diagnoses for major depressive disorder, bipolar II disorder, and ADHD were not medically determinable impairments because they were not diagnosed by acceptable medical sources since Ms. Butler turned eighteen. (*Id.* at 13–14). The ALJ then concluded that Ms. Butler does not suffer from an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.* at 13–16).

After considering the evidence in the record, the ALJ determined that Ms. Butler "has the residual functional capacity to perform a full range of work at all exertional levels but with" several "nonexertional limitations," such as limiting work to "simple, routine tasks at a non-production rate pace"; "simple work-related decisions"; only "occasional[] interact[ion] with supervisors and . . . coworkers, but no tandem work"; no interaction with the public; and "few changes in a routine work setting." (Doc. 6-3 at 17). Based on this residual functional capacity and the

11

testimony of a vocational expert, the ALJ found that Ms. Butler could perform jobs that exist in significant numbers in the national economy such as laboratory cleaner, hand bander, and sticker. (*Id.* at 25). Accordingly, the ALJ determined that Ms. Butler had not been under a disability, as defined in the Social Security Act, from her alleged May 14, 2006 onset date through the date of the decision. (*Id.* at 26).

## IV.  DISCUSSION

Ms. Butler argues that the court should reverse and remand the Commissioner's decision on the ground that the ALJ erred in evaluating Ms. Butler's mental impairments under the five-step sequential evaluation process, specifically at steps two, three, and four. (Doc. 12 at 15–24).

### 1.  The ALJ Did Not Err at Step Two

Ms. Butler argues that the ALJ erred at step two by finding that Ms. Butler's learning disorder and ADHD were not medically determinable impairments. (*Id.* at 16). Ms. Butler contends that the ALJ ignored several acceptable medical sources who diagnosed her with a learning disability and/or severe ADHD. (Doc. 12 at 17; *see, e.g.*, doc. 6-4 at 11 (Dr. Walter); *id.* at 18 (Dr. Saxby); doc. 6-11 at 117 (Dr. Russell)). According to Ms. Butler, the ALJ's finding involved the cherry-picking of facts in the record, which she argues is legal error. (Doc. 12 at 17) (citing *Lewis v. Berryhill*, 858 F.3d 858, 869 (11th Cir. 2017)).

But Ms. Butler has not demonstrated that the omission of other severe impairments at step two resulted in "fundamental unfairness or prejudice." *Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1274 n.11 (11th Cir. 2024); *see also Flowers v. Comm'r, Soc. Sec. Admin.*, 97 F.4th 1300, 1307 (11th Cir. 2024) (finding harmless error where the plaintiff failed to show that his argument would make any difference to his application for disability benefits). When an ALJ recognizes at least one severe impairment and proceeds to step three of the sequential evaluation process, he is not required to identify additional impairments if he properly considered all impairments at subsequent steps. *See Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 Fed. App'x 949, 951 (11th Cir. 2014);[1] *see also Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) (Step two serves as a "a filter" which, so long as any severe medical impairment is found, allows the ALJ to proceed with the rest of the five-step analysis.).

Here, the ALJ recognized Ms. Butler's anxiety disorder and PTSD as severe impairments, which allowed him to proceed with the evaluation process. (Doc. 6-3 at 14; *see id.* at 14–26). And the ALJ considered Ms. Butler's learning disorder and attention span at step four when he determined Ms. Butler's residual functional capacity. (*See id.* at 18 (noting that "Ms. Butler had an IEP [in high school] because

---

[1] Although *Tuggerson-Brown* is an unpublished opinion, the court finds it persuasive. *See McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060 (11th Cir. 2022).

of a specific *learning disability*") (emphasis added); *id.* at 20, 21, 23 (describing Mr. Foy's psychotherapy notes indicating that Ms. Butler "had a normal *attention span*") (emphasis added); doc. 6-3 at 22 (considering Dr. Saxby's finding that Ms. Butler could "maintain concentration and *attention* for two[-]hour periods") (emphasis added)). Because the ALJ found at least one severe impairment and properly considered the other impairments at subsequent steps, the ALJ did not err at step two.

### 2. Substantial Evidence Supports the ALJ's Determination at Step Three

Ms. Butler next argues that the ALJ erred at step three by finding that she failed to meet Listing 12.05(B) found in 20 C.F.R. Pt. 404, Subpart P, Appendix 1. (Doc. 12 at 18–24). As it relates to Ms. Butler, Listing 12.05(B) requires: (1) a full scale IQ score of seventy through seventy-five; and (2) a qualifying part score—in verbal, performance, or any comparable part—of seventy or below; and (3) "significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation" in: (a) understanding, remembering, or applying information; (b) interacting with others; (c) concentrating, persisting, or maintaining pace; or (d) adapting or managing oneself; and (4) that the evidence demonstrates the disorder began before age twenty-two. 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 at § 12.05(B)(1)–(2).

A claimant bears the burden of proving that she meets or equals a listed impairment. *Barron v. Sullivan,* 924 F.2d 227, 229 (11th Cir. 1991). "To meet a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (quotation marks omitted). "To equal a listing, the medical findings must be at least equal in severity and duration to the listed findings." *Id.* at 1224 (quotation marks omitted).

Ms. Butler makes three criticisms of the ALJ's determination at step three. First, Ms. Butler argues the ALJ's finding of moderate deficits in adaptive functioning lacks substantial evidence on the record. (Doc. 12 at 19–25); *see* 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 at § 12.05(B)(2). The ALJ acknowledged that although Ms. Butler struggled to leave the house on her own because of her anxiety, she could handle many activities by herself, such as personal care, household chores, online communication, eating and sleeping, and caring for pets. (*See* doc. 6-3 at 15). In support of this finding, the ALJ cited to Dr. Russell's evaluation of Ms. Butler. (*Id.*) (citing doc. 6-11 at 116 (noting that Ms. Butler "enjoys taking care of all of her animals" and cooking, "is fully independent with all activities of daily living," "can navigate her cell phone," and has no difficulty sleeping)). Accordingly, substantial

evidence supports the ALJ's determination. *Henry*, 802 F.3d at 1267 (11th Cir. 2015).

Second, Ms. Butler asserts that the ALJ failed to recognize her working memory index score of sixty as a qualifying "comparable part" score. (Doc. 12 at 18); 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 at § 12.05(B)(1). The ALJ found that although Ms. Butler had a qualifying full scale IQ score of seventy-one, she did not have an accompanying verbal or performance IQ score of seventy or below. (Doc. 6-3 at 17). The ALJ then noted that Ms. Butler received a working memory score of sixty. (Doc. 6-3 at 17). Ms. Butler argues that her working memory score of sixty was a qualifying comparable part score that entitled her to meet Listing 12.05(B)(1).

Ms. Butler again fails to show how this error prejudiced her. *See Raper*, 89 F.4th at 1274 n.11; *Flowers*, 97 F.4th at 1307. Regardless of whether Ms. Butler meets Listing 12.05(B)(1) with a working memory score of sixty, the ALJ found that Ms. Butler did not meet Listing 12.05(B)(2) because her deficits in adaptive functioning were only moderate. (Doc. 6-3 at 14–16). As discussed above, the court finds that the ALJ's determination about Ms. Butler's moderate deficit in adaptive functioning is supported by substantial evidence. Therefore, any error in the ALJ's identification of qualifying IQ scores is harmless.

Third, Ms. Butler contends that the ALJ incorrectly applied Social Security Administration regulations when he used activities requiring assistance or

16

accommodations as the bases for finding only moderate deficits in adaptive functioning. (Doc. 12 at 22–24) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 at § 12.00(F)(2), 12.00(H)(3)(d)(2)). But as stated in the preceding section, the ALJ relied, at least in part, on Dr. Russell's evaluation of Ms. Butler. (Doc. 6-3 at 17). And Dr. Russell explicitly found that Ms. Butler was "fully independent with all activities of daily living." (Doc. 6-11 at 116). The ALJ's determination of Ms. Butler's moderate deficit in adaptive functioning is therefore supported by substantial evidence. *Henry*, 802 F.3d at 1267.

### 3. Substantial Evidence Supports the ALJ's Determination at Step Three

Finally, Ms. Butler argues that the ALJ erred in his residual functional capacity determination for the same reason that he erred in finding that Ms. Butler had only moderate deficits in adaptive functioning: he did not consider her ability to function independently. (Doc. 12 at 24). But this argument fails for the same reason it fails above. The ALJ specifically considered Dr. Russell's notes on Ms. Butler's "full[] independen[ce] in activities of daily living," including cooking and "taking care of all of her animals," in determining Ms. Butler's residual functional capacity. (Doc. 6-3 at 20) (citing doc. 6-11 at 116). Thus, the ALJ's residual functional capacity determination is supported by substantial evidence. *Henry*, 802 F.3d at 1267.

## V.    CONCLUSION

Substantial evidence supports the ALJ's denial of Ms. Butler's applications for disability insurance benefits and SSI. Accordingly, the court **WILL AFFIRM** the Commissioner's decision.

The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 11, 2025.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE